IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:24-CR-207-RAH-KFP |
| | ) | |
| LAKEVIC JAMEZ MOSS | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Before the Court is Defendant Lakevic Jamez Moss's Motion to Suppress. Doc. 40. The Government opposes the motion. Doc. 51. The Court held a hearing on the motion on August 16, 2024. Upon consideration of the testimony presented at the hearing, the evidentiary submissions, and the parties' arguments, the undersigned recommends Moss's motion be DENIED.

**I.      FACTUAL BACKGROUND**

On February 16, 2024, an arrest warrant was issued for Moss for the charge of murder. Tr. 42:23–43:1.[1] On February 20, 2024, Officer Quintarus Brooks ("TFO Brooks") with the United States Marshals Service Gulf Coast Regional Fugitive Task Force was assigned the investigation to locate and arrest Moss on the warrant. Gov't Ex. 2. at 1.

Through his investigation, TFO Brooks learned that Moss left the scene of the murder in an orange Dodge Challenger displaying a Stivers Ford tag. Gov't Ex. 2 at 1; Tr. 9:1–20. TFO Brooks further discovered that the Challenger was reported stolen. *Id*. The Challenger was seen parked near 2512 Promlake Court, Apartment 1, in Montgomery,

---

[1] The hearing transcript is cited here as Tr. at page:line number. It is in the docket as Doc. 57.

Alabama. *Id*; Gov't Ex. 2. at 1. Moss's mother was listed on the lease of that apartment, and TFO Brooks's investigation confirmed that Moss lived in the apartment. Gov't Ex. 2. at 1; Tr. 10:7–16.

In February 2024, the task force conducted surveillance on a different vehicle—one registered to Moss's mother, a silver Nissan Versa. Tr. 7:25–8:8. During the surveillance, the vehicle was seen outside of the 2512 Promlake Court, Apartment 1 residence and two men walked out of the apartment and got into the vehicle. Tr. 8:6–10. The task force officers believed one of the men was Moss. *Id*. When they attempted to conduct an investigative stop of the vehicle, the driver failed to comply and a vehicle pursuit ensued. Tr. 8:10–14. The pursuit ended with a pit maneuver being utilized to stop the fleeing vehicle. *Id*. The two subjects fled from the vehicle, but they were apprehended. Tr. 8:10–16. A trafficking amount of marijuana and firearms were found. Tr. 8:19–21. Neither subject turned out to be Moss. Tr. 8:10–16.

On March 12, 2024, TFO Brooks along with other law enforcement officers went to 2512 Promlake Court, Apartment 1, to serve the arrest warrant on Moss. Tr. 10:14–18. TFO Brooks's bodycam video, admitted into evidence, recorded the events of the arrest that morning. Gov't Ex. 1;[2] Tr. 22:18–23:2, 25:6–10.  Before 6:00 a.m., TFO Brooks and other members of the task force set a security perimeter around the apartment; when that was in place, other officers started the knock and announce procedure. Gov't Ex. 1 at

---

[2] The bodycam footage is in two parts on the disc admitted as Government's Exhibit 1. The first video covers the time period from 5:44 a.m. to 6:04 a.m. and is cited here as Gov't Ex. 1 and includes the relevant minute marker of the video. The second video covers the time period 6:38 a.m. to 6:42 a.m. and is cited here as Gov't Ex. 1 (part 2) and also includes the relevant minute marker of the video.

00:40–01:42; Tr. 10:22–11:3. Beginning at 5:45 a.m., officers are heard and seen on the bodycam recording knocking and loudly announcing, "Police. Police with a warrant, come to the door"; "U.S. Marshals with a warrant, open the door"; "U.S. Marshals come to the door." Gov't Ex. 1 at 01:42–6:31; Tr. 11:4–11. Officers remained at the front door knocking and announcing for several minutes. *Id*. Although lights were on inside the apartment, no one responded to the task force officers' knocking and announcing at the front door. *Id*. At about 5:52 a.m., TFO Brooks called Moss's mother from his cellphone and asked for her assistance to get Moss to come outside, and he advised her that officers were there to arrest Moss on the murder warrant. Gov't Ex. 1 at 08:31–10:02; Tr. 11:22–12:13. At 5:54 a.m., Senior Inspector David Onofry got on the intercom of TFO Brooks's vehicle and called Moss by name, "Lakevic. Lakevic Moss. U.S. Marshals. The apartment complex is surrounded. Open the door. Come out nice and slow and show me your hands. Do it now." Officers then initiated the sirens. Gov't Ex. 1 at 10:38–11:10; Tr. 12:15–19. At about 5:55 a.m., Moss complied and came to the door. Tr. 13:2–9, 31:19–22; Gov't Ex. 1 at 11:10. When he opened the door and came to the threshold, the door started to close back in front of him, but an officer stopped it from closing and Moss opened it a second time and appeared with his hands up; he was escorted out and placed in custody. Tr. 13:19–14:10; Gov't Ex. 1 at 11:16–18; 11:23. Moss came out wearing only underwear, sweatpants, and socks. *Id*.

The apartment's front door opened to a staircase leading up to the apartment's living space. Tr. 12:20–24; Gov't Ex. 3. Moss's bedroom was at the top of the stairs on the left, an open living and kitchen area with a balcony was to the right of the staircase, followed

3

by another bedroom and small hallway with a bathroom. Tr. 25:14–28:17; *see* Gov't Exs. 3–12. At least one other individual could be seen on the stairs leading up to the living space as the door opened and Moss began exiting. Gov't Ex. 1 at 11:23–25; Tr. 14:4–17. TFO Brooks saw one individual retreating back up the stairs as the door was beginning to close before it was reopened. Tr. 14:4–10. TFO Brooks was surprised there were additional people inside the apartment because they expected only Moss and possibly his mother to be in the apartment. Tr. 14:15–15:5; Gov't Ex. 2 at 2. Officers can be heard asking who else is inside and instructing anyone inside to come outside the apartment. Gov't Ex. 1 at 11:25–34; Tr. 15:6–9. Three more people exited the residence and were detained along with Moss. Tr. 15:6–14.

Once the individuals who came out upon instructions were detained, officers began a protective sweep. Tr. 15:12–15. While other officers performed the protective sweep, TFO Brooks secured Moss by placing him in handcuffs and patting him down. Tr. 16:7–18; Gov't 1 at 11:30–12:01. Moss asked Brooks to get him some clothing (a shirt and shoes) from inside. Tr. 16:10–14.

During the protective sweep, officers found in plain view two firearms placed on top of shoe boxes next to a bed in one bedroom and in another bedroom officers saw the stock of an apparent AR rifle or AR-styled pistol along with multiple boxes of ammunition inside an open closet. Tr. 18:20–19:7, 27:17–22, 28:10–24, 28:25–29:6; Gov't Exs. 11–14. After the protective sweep, officers informed TFO Brooks of their plain view findings, and he went inside to observe the findings. Tr. 19:25–20:6; Gov't Ex. 1 at 15:49–16:25. TFO Brooks then he called the detective in charge of the murder investigation,

Investigator/Detective Jackson with the Montgomery Police homicide unit. Tr. 19:25–20:15.

Prior to the service of the arrest warrant on Moss, TFO Brooks talked with Investigator Jackson, and she advised Brooks that the murder weapon in Moss's case had not been located. Tr. 19:8–24. Investigator Jackson planned to get a search warrant for the location where Moss was taken into custody. *Id*. Following his call with Investigator Jackson on the morning of the arrest, the TFO Brooks and the officers held the scene to secure it while a search warrant was pursued. Tr. 21:2–5; *see also* Gov't Ex. 2 at 2.

Before transporting Moss to the Montgomery Police Department, at about 6:38 a.m., TFO Brooks went back inside the apartment at Moss's request to retrieve for him a hoodie and shoes from his bedroom. Tr. 21:2–20, 34:7–23; *see also* 25:24–26:1, 26:6–8; Gov't Ex. 1 (part 2) at 00:34–02:46.

It is unclear precisely when the protective sweep began or exactly how long it lasted, but the credible testimony and evidence establish that it began after Moss and the three unexpected individuals came outside the apartment and were detained. Tr. 13:19–15:15; Gov't Ex. 1 at 15:00–18:48. Moss did not open the door until 5:55 a.m. and the other three individuals came outside sometime in the several minutes following his exit. Gov't Ex. 1 at 11:10–14:38. The bodycam also shows that by 6:00 a.m. officers had discovered in plain view the firearm sticking out from underneath the bed in the guest bedroom and contacted TFO Brooks to report it. Gov't Ex. 1 at 15:54–16:25. At 6:02 a.m., after talking with the three detained individuals and loading Moss into his vehicle, TFO Brooks went inside to observe what officers had reported observing in plain view. Gov't Ex. 1 at 18:48–19:30.

The Court finds, based on the evidence, that the protective sweep occurred sometime between 5:55 a.m. and 6:00 a.m.

## II.  DISCUSSION

Moss argues officers conducted an unlawful warrantless search of his apartment. He moved to suppress "all tangible evidence, in addition to any derivative evidence (or "fruit") of those items and statements, obtained by the United States, as a result of the unlawful search" of the apartment during his arrest on March 12, 2024. Doc. 40 at 1, 5. But Moss never specifically identifies for the record what evidence he seeks to suppress. The Government argues that law enforcement conducted a lawful protective sweep that revealed in plain view firearms and ammunition. The Government also argues that the items would have been inevitably discovered because Moss consented to TFO Brooks entering the apartment when he directed TFO Brooks to enter his bedroom to retrieve the requested clothing and shoes.

### A. Applicable Legal Principles

The Fourth Amendment safeguards the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. While a search conducted in the absence of a search warrant is presumptively unreasonable, *Groh v. Ramirez*, 540 U.S. 551, 559, (2004), an exception to the rule exists for a protective sweep.

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). The sweep must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id*. "Law enforcement officers are

6

permitted, in the context of a valid arrest, to conduct a protective sweep of a residence for officers' safety." *United States v. Yeary*, 740 F.3d 569, 579 (11th Cir. 2014). This type of sweep often occurs in the immediate vicinity of an arrest; for example, when officers sweep the room where the arrest takes place inside a home. *See, e.g.*, *United States v Hollis*, 780 F.3d 1064, 1067 (11th Cir. 2015) (officers used a battering ram to open door and arrest defendant and then swept the apartment).

> To justify a protective sweep beyond the immediate location of the arrest, officers must have reasonable suspicion "that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334. Reasonable suspicion is an analysis of "the totality of the circumstances—the whole picture." *United States v. Sokolow*, 490 U.S. 1, 8 (1989) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). "Whether or not a Fourth Amendment violation has occurred depends upon objective reasonableness in light of the facts and circumstances." *United States v. Hromada*, 49 F.3d 685, 691 (11th Cir. 1995).

*United States v. Yarbrough*, 961 F.3d 1157, 1163 (11th Cir. 2020). "Officers have a legitimate interest 'in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack.'" *Hromada*, 49 F.3d at 690 (quoting *Buie*, 494 U.S. at 333).

### B. The Protective Sweep was Objectively Reasonable

Here, law enforcement was executing a murder arrest warrant. Although that gave them authority to enter the house, Moss emerged from inside the home, so the arrest took place outside the home. Thus, the Court must consider whether the facts known to the officers gave rise to a reasonable suspicion that a dangerous individual was located inside the apartment in order to support the protective sweep inside. As explained below, the

7

Court finds based on the totality of the circumstances, "the officers had a reasonable, objective apprehension for their safety sufficient to justify a protective sweep." *See Yarbrough*, 961 F.3d at 1163.

First, officers were on the scene to serve a warrant for murder. The violent nature of that alleged crime cannot be overlooked, particularly when the arrest will take place at the defendant's home. *See Hromada*, 49 F.3d at 690 n. 9 ("[T]he dangers presented by in-home arrests are often greater than those conducted on the street due to the 'home turf' advantage the suspect has over the police."). Second, the investigation leading up to the March 12 warrant service indicated that weapons and drugs might be associated with the apartment. TFO Brooks testified that Moss's mother's vehicle, the Nissan Versa, was surveilled outside the apartment, that two individuals who left that apartment used her vehicle to flee from police, and that during their apprehension, a trafficking amount of drugs was recovered along with firearms. Tr. 7:25–8:25, 39:1–16. Moss was not in the vehicle, and this event would not, alone, support the protective sweep. But law enforcement's knowledge of this recent criminal activity connected to Moss's apartment is part of the "whole picture," and it is an additional factor supporting their reasonable belief they could be entering a dangerous situation. *See Yarbrough*, 961 F.3d at 1163 ("[W]e have stated that 'officers on the scene had reasonable cause to believe they were entering a volatile and potentially dangerous situation' in part because of a 'prior report of gunshots' from an anonymous source." There, those "tips supported an inference that the Yarbrough's

8

home was a source of possible drug activity.") (quoting *United States v. Holloway*, 290 F.3d 1331, 1340 (11th Cir. 2002)).

A third factor supporting the officers' reasonable suspicion that dangerous people might be hiding inside the apartment is that three unexpected people emerged from the apartment after Moss. TFO Brooks testified that law enforcement expected only Moss and potentially his mother to be inside the apartment; no one else was anticipated to be found there at 5:45 a.m. when they planned to serve the warrant. Tr. 67:6–10. TFO Brooks observed one individual retreat up the stairs. Tr. 14:4–10. Additionally, TFO Brooks testified that it took Moss a long time to emerge from the apartment—10 minutes, which Brooks testified was a long time given that most people respond within two to three minutes. Tr. 13:10–16, 18:4–18; *see also* 51:21–24. "Evasive or furtive behavior can factor into an officer's determination of reasonable suspicion." *Yarbrough*, 961 F.3d at 1165 (finding that defendant's wife fleeing to the bathroom when an officer called her name was a factor supporting officer's reasonable suspicion that a dangerous person might be hiding in the house). The length of time for Moss to comply with law enforcement's directive to come out along with the presence of these unexpected individuals, who had to be commanded to come outside, reasonably lead officers to believe others could be hiding inside. *See* Tr. 18:419, 53:5–13, 64:2–11, 67:6–14. TFO Brooks also testified that the protective sweep was necessary before he went inside to retrieve the clothing items Moss requested when Brooks was placing him in custody. Tr. 67:15–22. Because the officers had no way of knowing if anyone else remained inside after the three unexpected

individuals exited the apartment upon officers' commands, it was reasonable for law enforcement to believe someone could possibly have remained inside.

Finally, and significantly, TFO Brooks testified about the layout of the apartment, which put law enforcement officers at risk. Because the apartment opened to a set of stairs, other individuals could have been hiding upstairs, elevated above the officers, with an advantageous position to cause harm to the officers. Tr. 18:4–19. Thus, officers could have had reasonable concern that someone could be upstairs hiding and unexpectedly launch an attack on them below.

Although the evidence does not permit a definitive finding on the length of the sweep, the Court finds Moss's argument that the sweep took almost an hour based on the length of the bodycam video unsupported. The evidence before the Court establishes that the sweep occurred sometime after Moss emerged at 5:55 a.m. and before 6:00 a.m. when TFO Brooks was advised of officers' plain view findings. Additionally, the apartment's spaces within the sweep were not extensive—two bedrooms with open closets, an open living and kitchen area in between the bedrooms, and the bathroom. *See* Gov't Exs. 5–14. With this, the Court finds the sweep was properly limited in scope, and that, too, is a factor in favor of justification. *See Yarbrough*, 961 F.3d at 1165 ("The brevity of the sweep is a point in favor of its justification.") (citing *Hromada*, 49 F.3d at 690 ("There is no evidence that the officers opened drawers or that the sweep of the house was overextensive. In fact, the sweep was short; it lasted only about a minute."); *United States v. Caraballo*, 595 F.3d 1214, 1225 (11th Cir. 2010) ("Further, the record does not suggest that the sweep was anything other than a limited protective sweep; [the officer] simply opened the door to the

one large concealed living area of the boat where another person easily could have been hiding."); *Yeary*, 740 F.3d at 580 ("Moreover, the sweep was limited in scope; it was only coincidental that one of the deputies discovered contraband in plain view while conducting the sweep."); *United States v. Delgado*, 903 F.2d 1495, 1502 (11th Cir. 1990) (finding a protective sweep proper where it lasted "no longer than necessary" and was "no more than three to five minutes")).

Viewed in the totality of the circumstances, together these are specific and articulable facts giving rise to a reasonable suspicion justifying law enforcement's protective sweep.[3]

## III. CONCLUSION

Accordingly, for the reasons set forth above, the Magistrate Judge RECOMMENDS that Moss's Motion to Suppress (Doc. 40) be DENIED.[4]

It is further ORDERED that by **September 19, 2024**, the parties may file written objections to this Recommendation.[5]

---

[3] At the hearing, Moss also seemed to argue that the actions of law enforcement were a smokescreen to conduct a search because the arrest warrant was served without issue when Moss came out of the apartment with his hands raised and it was Investigator Jackson's intent all along to search the apartment. However, the Court finds this argument unpersuasive to undermine the Court's finding that the sweep was proportionate and reasonable. *See Hromada*, 49 F.3d at 691 ("Just because a police officer is *glad* to have the opportunity to see that which is apparent at the scene of a valid arrest—when it is his *duty* to make the arrest—does not make his seeing these things invalid." And further, "[j]ust because the police officers were *glad* that they could capitalize on the opportunity by incidentally seeing what was in plain view is of no moment. Whether or not a Fourth Amendment violation has occurred depends upon objective reasonableness in light of the facts and circumstances.").

[4] Because the Court recommends denial of the motion to suppress based on the protective sweep, the Court pretermits discussion on the Government's alternative inevitable discovery argument.

[5] Because this case is set for trial on September 30, 2024, the Court finds that exigent circumstances exist and shortens the objection period to give the District Judge time to consider any objections before trial. The Magistrate Judge scheduled the suppression hearing on August 1, but, at that hearing, Moss moved, with sufficient grounds, to continue the hearing two weeks to August 16. The Government did not oppose the

An objecting party must identify the specific portion of the factual findings or legal conclusions to which the objection is made and must describe in detail the basis for the objection. Frivolous, conclusive, or general objections will not be considered. The Recommendation is not a final order and, therefore, is not appealable.

Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with 28 U.S.C. § 636(b)(1) will bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waive the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except on grounds of plain error or manifest injustice. *See* 11TH CIR. R. 3-1.

DONE this 9th day of September, 2024.

/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE

---

continuance. The continuation necessarily condensed the period between the rescheduled hearing date and trial; thus, the objection period must be shortened due to the trial date. *See, e.g., Sabal Trail Transmission, LLC. v. 7.72 Acres in Lee Cnty., Alabama*, 2016 WL 10789585, at *2 (M.D. Ala. June 6, 2016); *U.S v. Shiver*, 2006 WL 3248544, at *3 (M.D. Ala. Nov. 8, 2006), *report and recommendation adopted,* 2006 WL 8446139 (M.D. Ala. Nov. 21, 2006), *aff'd in part, vacated in part, remanded,* 305 F. App'x 640 (11th Cir. 2008) (shortening period for objections to recommendation on motion to suppress).